1
 2025 CO 11 In Re The People of the State of Colorado, Plaintiff: v. Roberto C. Silva-Jaquez, Defendant: No. 24SA234
Supreme Court of Colorado, En Banc
March 3, 2025
 
          
 Original Proceeding Pursuant to C.A.R. 21 Adams County
 District Court Case No. 12CR3445 Honorable Stephen Enderlin
 Howard, Senior Judge
 
 
          
 Attorneys for Plaintiff: Brian Mason, District Attorney,
 Seventeenth Judicial District Cameron Munier, Senior Deputy
 District Attorney Brighton, Colorado
 
 
          
 Attorneys for Defendant: Zobel Law, LLC Cassandra Zobel
 Denver, Colorado
 
 
          
 Attorneys for Respondent Adams County District Court: Philip
 J. Weiser, Attorney General Emily Burke Buckley, Senior
 Assistant Attorney General
 
 2
 
           Joseph
 G. Michaels, Assistant Solicitor General Denver, Colorado
 
 
          
 Attorney for Amicus Curiae Office of Alternate Defense
 Counsel: Nathan S. Eagan Denver, Colorado
 
 
          
 JUSTICE SAMOUR delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD,
 JUSTICE GABRIEL, JUSTICE HART, and JUSTICE BERKENKOTTER
 joined.
 
 3
 
          Order
 Made Absolute
 
 
          
 OPINION
 
 
           SAMOUR
 JUSTICE
 
 
          ¶1
 A trial court enjoys ample discretion as it fills its
 case-management canvas. People v. Kilgore, 2020 CO
 6, ¶ 1, 455 P.3d 746, 747. But that discretion is not
 unfettered and does not permit coloring outside certain
 lines. Id.
 
 
          ¶2
 Roberto C. Silva-Jaquez petitions this court, pursuant to
 C.A.R. 21, for relief from the district court's
 postconviction order (the "discovery order")
 directing him to make certain disclosures to the prosecution
 regarding an expert witness he endorsed in connection with a
 Crim. P. 35(c) ineffective assistance of counsel claim (the
 "disclosures"). Although the postconviction court
 acknowledged its lack of authority under Crim. P. 16 to order
 discovery in a postconviction proceeding, it nonetheless
 believed that it could rely on its "inherent authority
 to manage its cases" to order Silva-Jaquez to provide
 discovery consistent with, and modeled after, that same rule.
 
 
          ¶3
 We now hold that a trial court may not rely on its inherent
 authority to order discovery in a postconviction proceeding.
 In Colorado, a trial court has no freestanding authority to
 order discovery absent authorization by a constitutional
 provision, statute, or rule. Thus, we make absolute the order
 to show cause and remand the case to the postconviction court
 for further proceedings consistent with this opinion.
 
 4
 
          I.
 Facts and Procedural History
 
 
          ¶4
 In 2014, following a jury trial, Silva-Jaquez was convicted
 of two counts of first degree murder, two counts of attempted
 first degree murder, and one count of second degree assault
 with a deadly weapon. A division of the court of appeals
 affirmed his convictions.
 
 
          ¶5
 Thereafter, Silva-Jaquez filed a pro se Crim. P. 35(c) motion
 seeking postconviction relief. The postconviction court
 appointed alternate defense counsel, who supplemented the
 motion. The supplemented motion alleged, generally, that
 Silva-Jaquez's trial counsel failed to provide effective
 assistance.
 
 
          ¶6
 After the parties briefed the supplemented motion, the
 postconviction court set the matter for an evidentiary
 hearing. Before the hearing, the prosecution filed a request
 to compel disclosures related to the defense's expert
 witness. Silva-Jaquez objected.
 
 
          ¶7
 The postconviction court granted the prosecution's
 request in a written order. In its analysis, the court relied
 largely on People v. Owens, 2014 CO 58M, ¶ 16,
 330 P.3d 1027, 1032, where we stated in passing that, in
 order to avoid surprise and any resulting delay at a
 postconviction evidentiary hearing, trial courts possess
 "the inherent authority to manage their dockets through
 scheduling orders" addressing the endorsement of
 witnesses and other timely disclosures. The postconviction
 court acknowledged that Owens dealt specifically
 with the
 
 5
 
 prosecution's discovery obligations in a
 postconviction proceeding and was not necessarily
 dispositive, but it nevertheless ruled that the
 above-referenced observation applied more generally and
 supported the prosecution's request to compel. Thus, the
 court found that it could require postconviction discovery
 pursuant to its inherent case-management authority.
 
 
          ¶8
 Beyond the aforementioned comment from Owens, the
 postconviction court leaned on the purpose behind Crim. P.
 16(II)(b), which, subject to constitutional limitations,
 permits trial courts to require defendants to make pretrial
 expert disclosures "to allow the prosecution sufficient
 meaningful information to conduct effective cross-examination
 under CRE 705." Crim. P. 16(II)(b)(2). In the
 court's view, this goal applies with equal force in
 postconviction proceedings.
 
 
          ¶9
 After a status hearing, the court issued another order
 clarifying its ruling. The court conceded that, by its own
 terms, Crim. P. 16 is inapplicable in the postconviction
 context. But it reiterated that a court's inherent
 authority, along with the rationale for discretionary
 pretrial disclosures regarding defense experts under Crim. P.
 16(II)(b), justified the discovery order:
 
 
 As noted in the Owens case, the court has the
 inherent authority to manage its cases through scheduling
 orders requiring the endorsement of witnesses and other
 timely disclosures, as deemed necessary to avoid
 delay-causing surprise at evidentiary hearings on
 post-conviction claims. To that end, the court has ordered
 the defense to provide expert disclosures consistent with the
 discretionary disclosure provisions of Crim. P. 16, Part
 II(b).... The court recognizes that Rule 16 does not, by its
 terms, apply to post-conviction
 
 6
 
 proceedings but concludes, as noted above, that it has
 authority to order disclosures consistent with the provisions
 of Rule 16, Part II(b).
 
 
          ¶10
 Silva-Jaquez sought our intervention pursuant to C.A.R. 21,
 and we issued an order to show cause.[1] We now explain why the
 exercise of our original jurisdiction is warranted.
 
 
          II.
 Jurisdiction Under C.A.R. 21
 
 
          ¶11
 "The exercise of our original jurisdiction under C.A.R.
 21 rests within our sole discretion." People v.
 Tafoya, 2019 CO 13, ¶ 13, 434 P.3d 1193, 1195. An
 original proceeding pursuant to C.A.R. 21 is "an
 extraordinary remedy that is limited in both purpose and
 availability." Kilgore, ¶ 8, 455 P.3d at
 748 (quoting People in Int. of T.T., 2019 CO 54,
 ¶ 16, 442 P.3d 851, 855-56). We have exercised our
 original jurisdiction before "when an appellate remedy
 would be inadequate, when a party may otherwise suffer
 irreparable harm, and when a petition raises 'issues of
 significant public importance that we have not yet
 considered.'" Id. (citations omitted)
 (quoting Wesp v. Everson, 33 P.3d 191, 194 (Colo.
 2001)).
 
 
          ¶12
 Silva-Jaquez contends that relief under C.A.R. 21 is
 appropriate because (1) he is facing irreparable harm and no
 other appellate remedy is adequate, (2) the
 
 7
 
 issue he raises is one of first impression, and (3) our
 resolution of the parties' dispute is of significant
 public importance. We agree on all three scores.
 
 
          ¶13
 First, Silva-Jaquez possesses no other adequate appellate
 remedy to avert irreparable harm because, as the saying goes,
 you can't put the genie back in the bottle. That is, once
 Silva-Jaquez complies with the discovery order, his
 disclosures cannot be unseen, unheard, or unknown, and he
 cannot be returned to his original position. Of particular
 concern, a portion of the disclosures is allegedly protected
 by the attorney-client and work-product privileges.
 
 
          ¶14
 Immediate review is appropriate where, as here, "the
 damage that could result from disclosure would occur
 regardless of the ultimate outcome of an appeal from a final
 judgment." Kilgore, ¶ 11, 455 P.3d at 749
 (quoting Ortega v. Colo. Permanente Med. Grp., P.C.,
 265 P.3d 444, 447 (Colo. 2011)). We have recognized that
 discovery orders implicating issues of privilege can cause
 irreparable harm. Id.; Hoffman v. Brookfield
 Republic, Inc., 87 P.3d 858, 861 (Colo. 2004).
 
 
          ¶15
 Second, this issue is one of first impression. As
 Silva-Jaquez notes in his petition, this court has considered
 issues relating to a defendant's discovery obligations in
 pretrial proceedings but has not yet passed judgment
 on whether a defendant has any discovery obligations in
 postconviction proceedings.
 
 8
 
          ¶16
 Third, Silva-Jaquez's petition raises a matter of
 significant public importance. Trial courts handling criminal
 dockets throughout the state regularly hold postconviction
 proceedings. According to Silva-Jaquez, it is not uncommon
 for the prosecution to request discovery in those
 proceedings. And, asserts Silva-Jaquez, there is no
 uniformity in how trial courts are currently resolving such
 requests.
 
 
          ¶17
 Having explained our decision to accept Silva-Jaquez's
 C.A.R. 21 petition, we are ready to address the merits of the
 contentions advanced by the postconviction court and the
 parties. Before we set sail, however, we consider the
 standard of review that guides our voyage.
 
 
          III.
 Standard of Review
 
 
          ¶18
 Typically, discovery orders in criminal cases are reviewed
 for an abuse of discretion. People in Int. of E.G.,
 2016 CO 19, ¶ 6, 368 P.3d 946, 948. The question we are
 faced with today, however, is a legal one: Whether the
 postconviction court improperly relied on its inherent
 authority in ordering Silva-Jaquez to provide discovery
 mirroring that permitted by Crim. P. 16(II)(b). See
 Kilgore, ¶ 13, 455 P.3d at 749. Thus, our review is
 de novo. Id. With that matter settled, we cast off.
 
 
          IV.
 Analysis
 
 
          ¶19
 "'The right of discovery in criminal cases is not
 recognized at common law,'" and thus, "district
 courts have 'no freestanding authority to grant criminal
 
 9
 
 discovery beyond what is authorized by the Constitution, the
 rules, or by statute.'" Id. at ¶ 15,
 455 P.3d at 749 (quoting E.G., ¶¶ 11, 13,
 368 P.3d at 949-50). Accordingly, we must look to these three
 (and only these three) sources to determine whether any of
 them authorizes the discovery order. We take up each source
 in turn.
 
 
          ¶20
 Neither the postconviction court nor the prosecution contends
 that the disclosures were authorized by a constitutional
 provision. Rightly so. After all, "it is well
 established that '[t]here is no general constitutional
 right to discovery in a criminal case.'"
 E.G., ¶ 23, 368 P.3d at 952 (alteration in
 original) (quoting Weatherford v. Bursey, 429 U.S.
 545, 559 (1977)). And while a defendant's
 constitutional rights may nevertheless require the
 prosecution to disclose certain information in a
 postconviction proceeding, see Owens, ¶ 2, 330
 P.3d at 1029 (explaining in a unitary postconviction review
 of a death penalty case that due process required the
 prosecution to disclose material information favorable to the
 defense), in this postconviction proceeding, we deal with
 information a defendant was ordered to disclose.
 
 10
 
          ¶21
 Likewise, neither the postconviction court nor the
 prosecution cites any statute that could have supported the
 disclosures. And we're aware of no such
 statute.[2] Thus, we do not linger on this possible
 source of authority.
 
 
          ¶22
 Finally, the postconviction court and the prosecution agree
 that no rule of criminal procedure expressly
 authorized the disclosures.[3] Here, again, we are on the same
 page. Still, the rules warrant a more detailed discussion
 because both the postconviction court and the prosecution
 draw guidance from them.
 
 11
 
          ¶23
 The first logical port of call is Crim. P. 16,
 "Discovery and Procedure Before Trial," which
 controls discovery in criminal cases. Kilgore,
 ¶ 16, 455 P.3d at 750. But Crim. P. 16 is altogether
 inapplicable here because, as its title reflects, it
 authorizes and outlines discovery before or during
 trial. Indeed, we have confirmed that "the requirements
 of Crim. P. 16 have not been extended beyond the facial
 applicability of that rule to information and material
 acquired prior to and during trial." Owens,
 ¶ 22, 330 P.3d at 1034. The postconviction court
 realized as much. While it modeled the discovery order after
 Crim. P. 16, it correctly acknowledged that the rule had no
 application here. Cf. Kilgore, ¶ 26, 455 P.3d
 at 751 (cautioning that a trial court's "inherent
 discretion to manage cases" may not "expand the
 contours" of Crim. P. 16).
 
 
          ¶24
 Crim. P. 35 is the next intermediate port on our itinerary.
 This rule, which controls procedures in the postconviction
 context, affords no safe harbor for the discovery order
 either. As the prosecution admits, Crim. P. 35 nowhere
 mentions discovery. Since Crim. P. 35 does not grant
 authority to order discovery in postconviction proceedings,
 it cannot sanction the disclosures.
 
 
          ¶25
 There are no other ports for us to explore. That is, we are
 aware of no other relevant rule, and the postconviction court
 and the prosecution have been unable to dredge one up.
 
 12
 
          ¶26
 The rules' silence on postconviction discovery is
 deafening. Such silence creates a limitation, not an
 opportunity. See Kilgore, ¶ 26, 455 P.3d at 751
 ("Thus, an omission from Rule 16 signifies something a
 district court lacks authority to order, not
 something it has authority to order.").
 
 
          ¶27
 Despite the lack of constitutional, statutory, or rule-based
 authority for postconviction discovery, the court
 nevertheless ordered the disclosures based on its inherent
 authority. And that brings us to the question front and
 center here: Does a postconviction court possess inherent
 authority to grant the prosecution's request for
 discovery? The answer is a simple "no."
 
 
          ¶28
 Of course, a trial court has inherent authority to carry out
 its duties, including as reasonably required to allow it to
 efficiently perform its judicial functions; to protect its
 dignity, independence, and integrity; and to effectuate its
 lawful actions. Laleh v. Johnson, 2017 CO 93, ¶
 21, 403 P.3d 207, 211-12 (relying on Pena v. Dist.
 Ct., 681 P.2d 953, 956 (Colo. 1984)). "These powers
 are inherent in the sense that they exist because the court
 exists; the court is, therefore it has the powers
 reasonably required to act as an efficient court."
 Id., 403 P.3d at 212 (quoting Pena, 681
 P.2d at 956).
 
 
          ¶29
 But inherent powers are not unlimited, and a trial court must
 proceed "cautiously" when invoking them.
 Id. (quoting Pena, 681 P.2d at 957).
 "Because of their very potency, inherent powers must be
 exercised with restraint and
 
 13
 
 discretion." Chambers v. NASCO, Inc., 501 U.S.
 32, 44 (1991). Certainly, in no instance may a trial court
 exercise its inherent authority to contradict statutes or
 court rules. People v. Justice, 2023 CO 9, ¶
 40, 524 P.3d 1178, 1186; see also Carlisle v. United
 States, 517 U.S. 416, 426 (1996) ("Whatever the
 scope of this 'inherent power,' . . . it does not
 include the power to develop rules that circumvent or
 conflict with the Federal Rules of Criminal
 Procedure.").
 
 
          ¶30
 Importantly, although we have endorsed a trial court's
 invocation of its inherent authority based on a wide range of
 rationales-from determining and compelling the payment of
 funds reasonably necessary to discharge its responsibilities,
 see Smith v. Miller, 384 P.2d 738, 741-42 (Colo.
 1963), to setting pretrial deadlines, see People v.
 Jasper, 17 P.3d 807, 815 (Colo. 2001)-we have never done
 so unless it is "necessary for its proper
 functioning." Pena, 681 P.2d at 957. Compelling
 expert disclosures (particularly from a defendant) in the
 context of a postconviction proceeding is simply not the sort
 of function necessary for the effective operation of a court.
 Thus, in addition to failing to comport with our longstanding
 jurisprudence on the availability of criminal discovery, the
 postconviction court's invocation of its inherent
 authority lacked the necessary function-related foundation.
 
 
          ¶31
 In fairness, the postconviction court is not the first trial
 court to improperly rely on its inherent authority to support
 a pretrial order. By our count, this is the
 
 14
 
 third time in the last five years that we disavow a trial
 court's exercise of its inherent authority.
 
 
          ¶32
 In 2020, in Kilgore, we rejected the
 prosecution's contention that the trial court's
 inherent authority to manage cases supported an order
 requiring the defendant to disclose his exhibits before
 trial. ¶¶ 25-26, 455 P.3d at 751. Two terms ago, in
 Justice, the shoe was on the other foot: It was the
 defendant urging us to uphold an order predicated on the
 trial court's inherent authority. ¶ 41, 524 P.3d at
 1186. We reversed, concluding that, whatever a trial
 court's inherent authority in a criminal case, it did not
 include ordering compulsory mediation. Id. We
 reasoned that such authority could not contravene the
 statutes granting sole discretion to the prosecution over
 plea bargaining. Id.
 
 
          ¶33
 Here, the postconviction court justified the exercise of its
 inherent authority with a comment we made in Owens,
 ¶ 16, 330 P.3d at 1032. We said there that "it is
 undisputed that district courts have the inherent authority
 to manage their dockets through scheduling orders requiring
 the endorsement of witnesses and other timely disclosures, as
 they deem necessary to avoid delay-causing surprise at
 evidentiary hearings on post-conviction claims, just as at
 criminal trials." Id. For several reasons, we
 are not persuaded that this statement can bear the extreme
 weight the postconviction court rested on its slender
 shoulders.
 
 15
 
          ¶34
 For starters, the remark in question is obiter
 dictum (Latin for "something said in
 passing"), i.e., "[a] judicial comment made while
 delivering a judicial opinion, but one that is unnecessary to
 the decision in the case and therefore not precedential
 (although it may be considered persuasive)."
 Dictum, Black's Law Dictionary (12th ed. 2024)
 (defining "obiter dictum"). Colorfully
 characterized in 1617 by Sir Francis Bacon as the
 "vapours and fumes of law," Francis Bacon, The
 Lord Keeper's Speech in the Exchequer, in 2
 The Works of Francis Bacon 478 (Basil Montagu ed.,
 1887), dictum has been recognized for centuries as
 nonbinding. See, e.g., Carroll v. Lessee of
 Carroll, 57 U.S. (16 How.) 275, 287 (1853) ("[T]his
 court . . . has never held itself bound by any part of an
 opinion, in any case, which was not needful to the
 ascertainment of the right or title in question between the
 parties."). Our passing reference to a trial court's
 inherent authority in Owens is textbook dictum.
 Inherent authority played no part in our ultimate holding.
 Rather, we determined that Owens's constitutional right
 to due process required the prosecution to disclose
 constitutionally material information favorable to him.
 Owens, ¶ 23, 330 P.3d at 1034.
 
 
          ¶35
 Owens is also distinguishable. There, it was the
 defense seeking information in the possession of the
 prosecution. Here, it's the prosecution seeking
 information in the possession of the defense. Of course, the
 prosecution doesn't have the
 
 16
 
 constitutional rights a criminal defendant enjoys. In fact,
 the prosecution does not (and cannot) cite any constitutional
 provision in support of the discovery order. ¶36
 Further, Owens involved a postconviction motion
 filed in a death penalty unitary proceeding. Id. at
 ¶ 1, 330 P.3d at 1028-29. The unique circumstances of
 death penalty litigation are plainly not present here.
 
 
          ¶37
 In any event, the excerpt in Owens to which the
 postconviction court anchored its ruling was an unremarkable
 observation: A trial court may issue scheduling orders
 pursuant to its inherent case-management authority. In
 support, we cited Jasper, 17 P.3d at 812.
 Owens, ¶ 16, 330 P.3d at 1032. There, we noted
 that "the setting of deadlines for pretrial matters
 constitutes an integral part of a trial court's case
 management authority." Jasper, 17 P.3d at 812.
 We wholeheartedly stand by that proposition today, just as we
 did in Owens, but it falls woefully short of
 permitting the discovery order.
 
 
          ¶38
 True, in Owens, we didn't simply refer to
 "scheduling orders"; we referred to
 "scheduling orders requiring the endorsement of
 witnesses and other timely disclosures." ¶ 16, 330
 P.3d at 1032. But we meant nothing more than orders setting
 timeframes for disclosures that are already authorized by a
 constitutional provision, statute, or rule. The
 postconviction court, instead, thought we meant orders
 requiring disclosures not otherwise authorized. Hence, the
 postconviction court misunderstood the passage in
 Owens to which it moored its decision.
 
 17
 
          ¶39
 We now reaffirm that a trial court may not rely on its
 inherent authority to order discovery in a postconviction
 proceeding. Rather, a court's authority to order
 discovery must be rooted in a constitutional
 provision, statute, or rule. Kilgore, ¶ 15, 455
 P.3d at 749 (relying on E.G., ¶ 13, 368 P.3d at
 950).
 
 
          ¶40
 Still, the postconviction court urges that, since Crim. P.
 35(c) contemplates the introduction of new evidence without
 providing guidelines for the management of discovery, trial
 courts must necessarily possess the inherent power to manage
 discovery, including by compelling expert disclosures. The
 postconviction court and the prosecution further contend that
 such power would vindicate the court's truth-finding
 function and promote judicial efficiency by eliminating
 surprise. We are unmoved.
 
 
          ¶41
 As a preliminary matter, the fact that Crim. P. 35(c) is
 silent on discovery does not reinforce the discovery order;
 it undermines it. As a division of the court of appeals
 recently pointed out, had our court "intended to allow
 such discovery in connection with a Crim. P. 35(c) motion, it
 easily could have said so. It did not." People v.
 Thompson, 2020 COA 117, ¶ 32, 485 P.3d 566, 572;
 see also Kilgore, ¶ 26, 455 P.3d at 751
 (explaining, in the context of Crim. P. 16, that the absence
 of a provision authorizing a particular pretrial disclosure
 didn't mean the district court was free to order it;
 rather, it signified a restriction on what the court could
 order).
 
 18
 
          ¶42
 Moreover, the practical consequences of having no discovery
 in a postconviction proceeding do not register on our concern
 barometer. Before a postconviction court may hold an
 evidentiary hearing, the defense must first show that the
 claim has colorable merit. See, e.g., People v.
 Segura, 2024 CO 70, ¶¶ 7, 26 n.8, 558 P.3d
 234, 237, 240 n.8; Crim. P. 35(c)(3)(V) (stating that a
 postconviction court may dispose of a Crim. P. 35(c) claim
 without a hearing if appropriate, and that if the court holds
 a hearing, it must take only that evidence necessary to
 dispose of the motion). Consequently, prior to any
 postconviction evidentiary hearing, the prosecution will
 necessarily have advance notice of the contentions supporting
 the claim. There is little risk of surprise.
 
 
          ¶43
 At any rate, in the unlikely event the prosecution is
 genuinely surprised at a postconviction evidentiary hearing,
 it may ask the court to pause the proceedings for a
 reasonable period of time. As the postconviction court
 recognized, if a "defense expert [were] to testify to
 matters that the prosecution was surprised by, the court, in
 the interests of justice, [could] continue the hearing to
 allow the prosecution time to reasonably respond."
 Nobody disputes that a postconviction court has the inherent
 authority to take this type of action.
 
 
          ¶44
 We are not unsympathetic to the postconviction court's
 efforts to avoid potential delay. But asking us to bless the
 discovery order based on that court's inherent authority
 seems a bit like asking Pandora to open her box. Disregarding
 
 19
 
 the legal boundaries of discovery in criminal cases in the
 name of expediency via a trial court's inherent authority
 at once invites chaos and undermines the Judicial
 Branch's interest in the uniform administration of
 justice. Cf. Dietz v. Bouldin, 579 U.S. 40, 48
 (2016) ("Because the exercise of an inherent power in
 the interest of promoting efficiency may risk undermining
 other vital interests related to the fair administration of
 justice, a district court's inherent powers must be
 exercised with restraint."). If discovery were left to
 the unguided and rudderless exercise of a trial court's
 inherent authority, what mechanism would we employ to ensure
 that defendants seeking postconviction relief are treated
 equally in different judicial districts or even among
 different judges within the same judicial district?
 
 
          ¶45
 This is to say nothing of the discovery litigation that would
 ensue as a matter of course in many postconviction
 proceedings. Hearings would abound, not only on the
 entitlement to discovery in the first instance, but on its
 proper scope as well, vitiating the very
 virtue-expediency-that the postconviction court sought to
 redeem. We decline to follow the prosecution into such
 uncharted waters.
 
 
          V.
 Conclusion
 
 
          ¶46
 In sum, trial courts have no freestanding authority to order
 discovery in criminal proceedings; such authority must stem
 from a constitutional provision, statute, or rule. When, as
 here, those sources do not provide for discovery, their
 silence is a limitation that may not be circumvented through
 a trial court's inherent authority. Because the
 postconviction court relied on its inherent authority in
 requiring the disclosures, it erred. Accordingly, we make
 absolute the order to show cause and remand the case to the
 postconviction court for further proceedings consistent with
 this opinion.
 
 
 ---------
 
 
 Notes:
 
 
 [1] Here's the sole issue raised in
 Silva-Jaquez's petition:
 
 
 1. Did the Adams County District Court err in ordering
 the defense to provide discovery disclosures mirroring those
 required by Crim. P. 16 in a postconviction
 proceeding?
 
 
 [2] Section 18-1-410, C.R.S. (2024), which
 addresses postconviction remedies, does not provide for
 discovery.
 
 
 [3] The prosecution argues that Crim. P.
 57(b) impliedly authorized the disclosures. That
 rule states that:
 
 
 If no procedure is specifically prescribed by rule,
 the court may proceed in any lawful manner not inconsistent
 with these Rules of Criminal Procedure or with any directive
 of the Supreme Court regarding the conduct of formal judicial
 proceedings in the criminal courts, and shall look to the
 Rules of Civil Procedure and to the applicable law if no Rule
 of Criminal Procedure exists.
 
 
 Id. However, the prosecution did not advance
 this contention below, so it is not properly before us.
 See Lambdin v. Dist. Ct., 903 P.2d 1126, 1132 (Colo.
 1995) (refusing, in an original proceeding, to address
 arguments not presented to the trial court). Besides, we have
 never interpreted Crim. P. 57(b) as permitting discovery when
 there is no constitutional provision, statute, or rule
 expressly authorizing it. Were we to read Crim. P. 57(b) as
 the prosecution proposes, it would risk eviscerating the
 parameters currently in place regarding discovery in criminal
 cases in Colorado. What's more, the approach championed
 by the prosecution would foster disparate discovery practices
 throughout the state-and not just in postconviction
 proceedings.
 
 
 ---------